MIRANDA KANE (CSBN 150630)
JULIA M. BREYER (CSBN 284706)
KANE+KIMBALL LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 704-1400
Email: mkane@kanekimball.com
Email: jbreyer@kanekimball.com

Attorneys for Marc Berger

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>MARC HOWARD BERGER,<br><br>              Defendant. | No. CR-17-0491-RS<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR DEFENSE-WITNESS IMMUNITY OR, IN THE ALTERNATIVE, DISMISSAL OF THE INDICTMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:       March 28, 2018<br>Time:      10:30 a.m.<br>Dept:      Courtroom 3, 17th Floor<br>Judge:    Hon. Richard Seeborg<br><br>Date Filed:  February 22, 2018<br><br>Trial Date:  July 9, 2018 |

**REDACTED VERSION OF DOCUMENT(S)  FOR PUBLIC FILING**

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:**

PLEASE TAKE NOTICE that on March 28, 2018, at 10:30 a.m., or as soon thereafter as counsel may be heard, in Courtroom 3, 17th Floor of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Marc H. Berger will and hereby does move for order for defense-witness immunity or, in the alternative, dismissal of the indictment for violation of the Fifth Amendment.

This motion is based upon the following Memorandum of Points and Authorities, the Declaration of Miranda Kane submitted herewith, the exhibits attached thereto, oral argument, and the pleadings and exhibits on file with the Court.

Respectfully submitted,

Dated: February 22, 2018     KANE+KIMBALL LLP

              */s/ Miranda Kane*
              MIRANDA KANE
              JULIA M. BREYER

              Attorneys for Marc Berger

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... i

I.  INTRODUCTION ...................................................................................................... 1

II.  BACKGROUND ...................................................................................................... 2

    A.  The Government's Allegations ........................................................................ 2

    B.  Administrative Proceedings Related to Mr. Burrill ...................................... 3

    C.  Criminal Investigation & Grand Jury Proceedings ...................................... 6

    D.  The U.S. Attorney's Office's Charging Decisions ...................................... 9

    E.  Procedural History of Criminal Case ........................................................ 11

    F.  Anticipated Witness Testimony ................................................................ 12

III.  LEGAL STANDARD ............................................................................................ 13

IV.  ARGUMENT ........................................................................................................ 14

    A.  The Government has Intentionally Placed the Proposed Defense Witnesses in Fear of Indictment to Provoke them into Invoking the Fifth Amendment .......... 14

        1.  The proffered defense witnesses will offer relevant exculpatory testimony ............................................................................................ 14

        2.  Absent a grant of immunity, the government's aggressive charging posture in this matter will force potential defense witnesses to invoke their Fifth Amendment rights against self-incrimination ........................ 15

    B.  The Government's Selective Refusal to Immunize Potential Defense Witnesses who would Contradict the Testimony of the Government's Immunized Witness would Distort the Fact-finding Process ........................... 16

IV.  CONCLUSION .................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

*Kawashima v. Holder*, 565 U.S. 478 (2012) ........................................................ 17

*United States v. Alessio*, 528 F.2d 1079 (9th Cir. 1976) .................................. 12, 18

*United States v. Alvarez*, 358 F.3d 1194 (9th Cir. 2004) ...................................... 12

*United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir. 1983) ............................ 16, 17

*United States v. Prince*, 524 F. App'x 377 (9th Cir. 2013) ...................................... 9

*United States v. Straub*, 538 F.3d 1147 (9th Cir. 2008) ............................... *passim*

*United States v. Westerdahl*, 945 F.2d 1083 (9th Cir. 1991) ....................... 13, 16, 19

*United States v. Wilkes*, 744 F.3d 1101 (9th Cir. 2014) ............................... 9, 17, 18

*United States v. Young*, 86 F.3d 944 (9th Cir. 1996) ......................................... 9, 18

*Williams v. Woodford*, 384 F.3d 567, 600 (9th Cir. 2004) ..................................... 9


**States and Other Authorities**

15 U.S.C. § 80b-6, 80b-17 ........................................................................................ 1

17 C.F.R. § 275.206(4)-8 ......................................................................................... 1

18 U.S.C. § 6002 .................................................................................................... 13

18 U.S.C. § 6003 .................................................................................................... 13

26 U.S.C. § 6531 .................................................................................................... 15

26 U.S.C. § 7206 ...................................................................................................... 1

Federal Rule of Evidence 804(b)(1) .......................................................................... 2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.     INTRODUCTION

Defendant Marc H. Berger, a CPA with over 40 years of accounting experience and an otherwise unblemished record, was on the eve of retirement when he was blindsided by an early morning arrest at his home in Walnut Creek, California on September 18, 2017, after a grand jury returned an indictment alleging three counts of aiding and assisting in the preparation of a false tax return in violation of 26 U.S.C. § 7206(2). The charges stem from Mr. Berger's role as a tax partner at Burr Pilger Mayer ("BPM"), a top regional accounting firm, where he was the engagement partner responsible for overseeing the preparation and signing of the tax returns of G. Steven Burrill and Kelli Burrill, as well as a number of Mr. Burrill's wholly-owned eponymous entities. Among them was Burrill Capital Management LLC ("Burrill Capital"), which served as the management company of Life Sciences Fund III ("Fund III" or the "Fund"), a venture capital fund in the biotech industry.

The indictment charges Mr. Burrill with wire and securities fraud relating to his directing cash transfers from Fund III to Burrill Capital in excess of the regular management fees to which Burrill Capital was entitled from 2009 through 2013, as well as tax evasion based on his failure to declare these cash transfers as income. *See* Dkt. No. 1 ¶¶ 7-11. Mr. Burrill pleaded guilty on December 7, 2017, to one count of Investment-Advisor fraud in violation of 15 U.S.C. §§ 80b-6 & 80b-17 & 17 C.F.R. § 275.206(4)-8 and one count of tax evasion in violation of 26 U.S.C. § 7206(1) pursuant to a written plea agreement ███████████████████████ ████████████. Dkt. No. 27.

The case against Mr. Berger turns on whether he knew that the transfers described above were prepaid management fees, as the government contends—in which case the full amount should have been classified as deferred revenue and included as income on Mr. Burrill's tax returns—or whether, as Mr. Berger maintains, he had reason to believe the transfers were properly characterized as loans for which Mr. Burrill was personally liable to repay—in which case the money was not taxable income. Mr. Berger needs to call the witnesses who are the subject of this motion in order to ~~present evidence of his state of mind in preparing Mr. Burrill's tax returns and, more specifically,~~

why he accepted Mr. Burrill's characterization of the transfers as loans. However, those witnesses, absent a grant of immunity, will invoke their Fifth Amendment right to remain silent if called to testify.

Mr. Berger therefore seeks an order directing the government to grant use immunity to other tax professionals from BPM who contributed to the preparation of the tax returns at issue in this case. Specifically, the BPM Witnesses include ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[1] Without such an order, the government will effectively prevent Mr. Berger from presenting a defense and, as a result, deny him his due process right to a fundamentally fair trial.

## II.    BACKGROUND

### A.    The Government's Allegations

The indictment charges Mr. Burrill with thirty-one counts, including various fraud charges and tax evasion. Dkt. No. 1. The indictment alleges that Mr. Burrill perpetrated a complex fraud scheme through which he initiated capital calls for Fund III investor funds totaling more than $18 million and used the money to cover cash flow shortages at the Burrill entities, which he wholly owned and controlled, in violation of the requirements of the Limited Partnership Agreement. *Id.* ¶¶ 1, 5-11.

The gravamen of the allegations against Mr. Berger is that he assisted in the preparation of false personal tax returns for Mr. Burrill and his wife by failing to treat the cash transfers from Fund III as income to Mr. Burrill. *Id.* ¶ 24. The indictment alleges that Mr. Berger was the signing partner and paid preparer on Mr. Burrill's returns and that other BPM accountants assisted in the

---

[1] Additionally, there are two other categories of exculpatory defense witnesses for whom Mr. Berger is not currently seeking immunity as he has no knowledge of their intention to invoke their Fifth Amendment right to remain silent if called to testify. They are members of the PwC audit team—████████████████████████████████████████—and individuals employed by or associated with Burrill entities, including staff and managing directors or investors—███████ ██████████████████████████████████████████████████████. Many of the witnesses in these categories testified under oath subject to cross examination in related administrative hearings before the SEC. Their former testimony may be admissible in the event they invoke the Fifth Amendment. *See* Fed. R. Evid. 804(b)(1). Mr. Berger reserves the right to move for compelled judicial immunity for these witnesses in the future.

DEFENDANT'S MOTION FOR
DEFENSE-WITNESS IMMUNITY
[CR-17-0491-RS]

2

preparation of the returns, which reported income and expenses related to the Fund, the Burrill entities, and Mr. Burrill individually. *Id.* ¶ 2. Mr. Berger is the only individual from BPM who has been criminally charged. Aside from a conclusory allegation that Mr. Berger made or caused false entries to be made on the books and records of the Burrill Entities, *id.* ¶ 9(f), there are no allegations suggesting that Mr. Berger was part of the larger fraud scheme charged against Mr. Burrill. In order for the government to sustain its burden, it must prove beyond a reasonable doubt that Mr. Berger actually knew that the facts did not support his tax treatment of the Fund III transfers at the time he assisted in preparation of Mr. Burrill's returns.

### B. Administrative Proceedings Related to Mr. Burrill

The instant case follows on the heels of extensive regulatory inquiries and administrative proceedings into Mr. Burrill's conduct. The IRS began an administrative audit of the Burrill entities in 2013, and later that year the matter was referred to the IRS Criminal Investigation Division ("CID"). Mr. Berger and his colleagues at BPM assisted in CID's investigation. Declaration of Miranda Kane ("Kane Decl.") ¶ 9.[2]

The SEC initiated administrative proceedings in 2014 to investigate securities law violations against Burrill Capital, Mr. Burrill, and two Burrill Capital executives: Victor Hebert, an experienced corporate attorney formerly of Heller Ehrman and longtime member of the California bar, who filled the roles of Chief Administrative Officer, Managing Director, and Chief Legal Officer, and Chief Financial Officer Helena Sen, a licensed CPA. The SEC did not investigate Mr. Berger.

BPM produced thousands of documents in response to SEC subpoenas it received in the spring of 2014. Kane Decl. ¶ 10. Mr. Berger testified as a witness in the SEC's administrative proceedings in August 2014. Ex. 3. Mr. Berger, represented by BPM's outside counsel, described in detail, among other things:

- His relationship with Mr. Burrill—friendly but strictly professional, though they had known each other for many years since they both worked as CPAs at Ernst & Young decades before, *id.* at SEC-SFRO-003040 – SEC-SFRO-003041;

---

[2] All exhibits referenced in this motion refer to those attached to the Kane Decl.

- The roles of other BPM staff who worked on the Burrill tax returns, including ████, *id.* at SEC-SFRO-003043;

- The conversations Mr. Berger had with ████████████ about the Fund III transfers—specifically, that Mr. Berger asked them if Mr. Burrill had personal liability for the cash transfers he saw listed as "deferred revenue" on the management company's books;

- That Mr. Berger relied on ████████████ representations regarding the characterization of the transfers as loans, *id.* at SEC-SFRO-003045 & 3054; and

- His recommendation, after ████████████ advised him that the transfers were a personal obligation debt, that the Burrill Capital books be modified to reflect the transfers as a liability rather than deferred revenue, and that Mr. Burrill execute a promissory note to further document the loan, *id.* at SEC-SFRO-003047 – SEC-SFRO-003061.

Regarding the creation of a promissory note, Mr. Berger testified that the intent of his recommendation was not to change the character of the cash transfers – because a promissory note cannot accomplish that, but to have documentary evidence to support their characterization as loans in the event of an IRS audit. *Id.* Mr. Berger testified that to his knowledge the promissory note was never executed. *Id.* at SEC-SFRO-003065.

Ultimately, the SEC settled the administrative proceedings against Mr. Burrill and his company colleagues on March 30, 2016, with the respondents neither admitting nor denying violations of securities laws. As part of the settlement, the respondents agreed to the entry of an administrative order finding that, with the help of Mr. Hebert and Ms. Sen, Mr. Burrill misappropriated approximately $18 million from Fund III under the guise of advanced management fees. Ex. 4. The SEC further found that Burrill Capital and Mr. Burrill willfully violated, and Mr. Hebert and Ms. Sen willfully aided and abetted and caused, Burrill Capital and Mr. Burrill to perpetrate a fraud on the fund's investors by lying to them about their use of the capital called to the Fund and using it instead for purposes unrelated to the Fund—namely, to float the other Burrill entities, and enrich Burrill personally. *Id.* at 9. The settlement did not involve charges or liability

1     for Mr. Berger.

2        The prestigious "Big Four" accounting firm PwC audited Fund III's financial statements.

3 Later, the SEC also brought administrative charges against Adrian Beamish, the PwC engagement

4 partner overseeing the audit. *See In re Adrian Beamish*, No. 3-17651 (SEC). Mr. Berger was not

5 implicated in this proceeding, either. The Beamish matter proceeded to a hearing before an

6 administrative law judge at which a number of the proposed defense witnesses here, as well as a

7 number of witnesses from PwC, provided testimony and were subject to both direct and cross

8 examination. PwC witnesses testified about the related parties footnote in the audited financials,

9 which historically disclosed that Fund III's "Prepaid expenses and other receivables" included

10 money – the amount which increased each year – "receivable from the general partner." Ex. 5.

11 PwC witnesses testified that in 2012 they proposed additional language to that footnote that would

12 have disclosed that Fund III had advanced more cash to the management company than could be

13 earned as management fees over the remaining life of the fund, but they removed that language

14 from the disclosures at Mr. Burrill's request. *See, e.g., id.* at SEC-SFRO-001741; Ex. 6 at SEC-

15 SFRO-001561 – SEC-SFRO-001562. They further testified that they learned of the promissory

16 note that documented the terms under which Mr. Burrill transferred additional cash from Fund III to

17 the management companies during the 2012 audit and recommended including the terms of the note

18 in the related parties footnote. PwC ultimately gave an unqualified opinion without altering the

19 related parties footnote in the financial statements after Ms. Sen told them the note had been

20 withdrawn. *See, e.g.*, Ex. 5 at SEC-SFRO-001737 – SEC-SFRO-001745; Ex. 6 at SEC-SFRO-

21 001556 – SEC-SFRO-001568.[3]

22        The Beamish matter settled on September 7, 2017. Ex. 7. Mr. Beamish neither admitted nor

23 denied violations of securities laws but agreed to the entry of an administrative order finding that he

24 failed to comply with professional standards by failing to scrutinize the cash transfers that Mr.

25 Burrill routed to his management company from Fund III and improperly signing audited financial

26 statements that did not comply with Generally Accepted Auditing Standard. *Id.* at 2. At bottom,

---

27 [3] There is no evidence in the record that the PwC auditors were in communication with BPM tax
28 preparers, which is not unusual, or that Mr. Berger was privy to dialogue between PwC and Mr.
Burrill and his associates regarding the Fund III audit.

DEFENDANT'S MOTION FOR                                          5
DEFENSE-WITNESS IMMUNITY
[CR-17-0491-RS]

the SEC found that Mr. Beamish failed to take sufficient steps to verify whether the management company had the ability to repay the Fund, rendering the audited financial statements misleading and inaccurate. *Id.* at 10-11. The SEC imposed a one-year bar on Mr. Beamish's ability to practice as an accountant. *Id.* at 12.

The California Franchise Tax Board ("FTB") also audited the Burrill entities' tax returns. Jeffry Bernstein of Coblentz Patch Duffy & Bass LLP, represented Mr. Burrill in that matter and Mr. Berger, at Mr. Burrill's request, assisted Mr. Bernstein in preparing a response. On June 2, 2016, Mr. Burrill, through Mr. Bernstein, represented to the FTB that the cash transfers from Fund III to the management company were loans for which Mr. Burrill was personally liable.[4] *See* Ex. 8.

## C. Criminal Investigation & Grand Jury Proceedings

The United States Attorney's Office also investigated Mr. Burrill with the assistance of the FBI and IRS-CID. In April 2015,                                    and engaged in a months-long attempt to produce responsive documents, though its efforts never appeared to satisfy the government.

                                                                                                . *See* Exs. 9-12. The same attorneys—a litigation firm that BPM typically retained for malpractice matters—represented all four BPM witnesses as well as the company.

The United States Attorney's Office ("USAO") initially attempted                                    . Two months later, the government asked their shared attorney to                                    . *See* Kane Decl. ¶ 17.                                    . *See id.* ¶ 18 & Exs. 9, 10. Consistent with Mr. Berger's 2014 SEC testimony,                                    . Ex. 9 at 116.

---

[4] This motion does not include emails between Mssrs. Burrill, Bernstein, and Berger because the parties are still litigating the issue of whether the attorney-client privilege prohibits disclosure of these communications. Mr. Berger intends to file a motion describing these privileged emails and other discovery issues separately. Mr. Berger anticipates that Burrill may waive privilege regarding these documents prior to the March 28, 2018 hearing in this matter. If so, Mr. Berger seeks leave to supplement the briefing to include relevant exhibits.



. Ex. 10 at 21-22, 26-27, 32.

. Ex. 9 at 97-100, 108; Ex. 10 at 23, 25-27, 33, 35-38, 45-50, 77-78.

. Ex. 9 at 82, 88-90, 101, 103, 108-109.

in March 2016,

. Kane Decl. ¶ 21 & Ex. 13.

. Ex. 13 at 7-8.[5]

. Ex. 13 at 88.

[6] Kane Decl. ¶ 5.

██████████████████████████████████████████. *See* Kane Decl. ¶ 31. He assumed the government had declined to prosecute Mr. Burrill and the matter was over. As it turned out, a new grand jury was empaneled in the summer of 2017.

. Ex. 14 at 42-43, 57-58.

. *Id.* at 44-46.

. *Id.* at 60-62.

. *Id.* at 67-68, 98.

. Ex. 16 at 33-38.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████.

Mr. Burrill was eventually indicted. So was Mr. Berger.

**D.    The U.S. Attorney's Office's Charging Decisions**

The grand jury returned an indictment against Messrs. Burrill and Berger on September 15, 2017. Dkt. No. 1. Three days later—sixteen months after he testified before the grand jury and having heard not a single word from the government during that time, *see* Kane Decl. ¶ 31—Mr. Berger was arrested at 7:00 a.m. without warning at his home in Walnut Creek by armed federal agents from the IRS and FBI. In contrast, Mr. Burrill, now residing in Wisconsin, received advance notice of the indictment from the USAO through counsel, and was allowed to make his own arrangements to voluntarily appear in this district for his initial appearance two weeks later. *See* Dkt. No. 7. The government did not seek detention for either defendant, and both were released on unsecured bonds.

As conspicuous as this post-charging arrest treatment between defendants is, the charging treatment of Mr. Berger compared to other individuals who admittedly assisted Mr. Burrill in perpetrating his fraud scheme is even more stark. On August 31, 2017, after the SEC settlement order included findings that Mr. Hebert was instrumental in Mr. Burrill's fraud and hid from the Fund's Investment Committee that he knew that Mr. Burrill was using the capital called to Fund III to float the other Burrill entities and to pay personal expenses, Ex. 4 ¶¶ 23-25, the government entered into a non-prosecution agreement ("NPA") with ████████, pursuant to which the government agreed not to prosecute ████████ in exchange for his testimony. Ex. 15 at US 008859 – US 008864.[8]

---

[8] Several witnesses testified that ████████ issued capital call letters to Fund III investors knowing that the money would not be invested. He also spearheaded the effort to minimize reference to the Fund III transfers in PwC's audited financials. *See, e.g.*, 14 at 36. The ████████ also indicated that ████████ was complicit in Burrill's fraud. *See, e.g.*, Ex. 17 at 5 (describing ████████'s statement that "[W]hat we did was probably illegal[,]" referring to Burrill and ████████'s conduct); Ex. 18 a 2 (noting that Burrill and ████████ were very close and Burrill allowed Hebert to act on his behalf); Ex. 19 at 2 ("████████ believed ████████ 'knew everything' with respect to the pre-calling and spending capital from Fund III."); Ex. 20 at 10 (describing his belief that ████████ knew that all of Fund III's capital had been called before the September 2013 disclosure to the managing directors).

That Mr. Berger should be criminally charged, while ▮▮▮ is shielded from prosecution is a mystifying exercise of prosecutorial discretion.[9] Presumably, the government determined that ▮▮▮ was essential to its case against Mr. Burrill as the factual statement attached to ▮▮▮'s NPA does not reference Mr. Berger or any communications had with him or other BPM tax preparation staff. Ex. 15 at US 008864.

Ex. 16 at 33-38

. *See* Ex. 23 at 11-12 & Grand Jury Ex. 82.

As of the filing of this motion, the government has represented that it has not yet entered into a non-prosecution agreement with ▮▮▮. However, without ▮▮▮ trial testimony, the government will be hard-pressed to make out a case against Mr. Berger since she was his primary Burrill entity contact.[10] *See* Kane Decl. ¶ 7. On September 20, 2017, ▮▮▮ and the government entered into a tolling agreement which tolled the statute of limitation on any possible charges against her until December 31, 2017. Ex. 22.

The USAO has represented that it has no plans to indict anyone else in this case and has already made charging decisions based on its assessment of the relative culpability of the individuals involved. Kane Decl. ¶ 6. The government has indicated that, for Mr. Berger, the fact

---

[9] The fact that ▮▮▮ received an NPA rather than immunity has no legal significance here. Government witnesses who are granted favorable plea deals in return for their testimony are "immunized" within the meaning of *Straub*. *See United States v. Wilkes*, 744 F.3d 1101, 1105 n.1 (9th Cir. 2014) (citing *United States v. Young*, 86 F.3d 944, 948 (9th Cir. 1996)).

[10] Mr. Berger does not presume to know how the government will ultimately resolve the outstanding immunity issue with respect to ▮▮▮. Throughout this motion, he assumes that ▮▮▮ will reach an arrangement with the government that allows her to testify. However, even if Mr. Berger's prediction is not born out, that does not alter his request for defense witness immunity.

that he signed the returns was the tipping point in the decision to file criminal charges against him, as opposed to others at BPM. *Id.*

### E.     Procedural History of Criminal Case

Mr. Burrill has entered a guilty plea to Investment-Advisor fraud and tax evasion pursuant to a written plea agreement. *See* Dkt. No. 27.  He agreed that he "improperly [took] money from the Fund that [he] knew [his] management companies were not entitled to[,]" ultimately causing "the Fund to transfer to entities [he] owned and controlled a total of approximately $8 million in excess of the total management fees that would have been earned over the course of the [Limited Partnership Agreement governing the Fund]." *Id.* at 5.  Mr. Burrill further agreed that he filed false tax returns in 2010, 2011, 2012, 2013 because he did not include as income the unauthorized advance management fees he caused to be transferred from the Fund to his management companies. *Id.* at 6.  Notably, the factual basis of Burrill's plea agreement does not implicate Mr. Berger in any wrongdoing.

On December 12, 2017, the Court set a jury trial for July 9, 2018, with jury selection to begin July 6, 2018.  Mr. Berger agreed to waive time until that date under the Speedy Trial Act.  On February 8, 2018, the parties were advised that the Court is no longer available in July and requested that the parties choose a trial date in August 2018.  The government is not available in August, and the parties have since filed a joint statement requesting a trial date in June 2018.

On February 5, 2018, counsel for Mr. Berger wrote to the government requesting that it consent to granting use immunity to the defense witnesses identified above.[11]  The government responded that it was unwilling to immunize any of the proposed defense witnesses.  Kane Decl. ¶ 4.

### F.     Anticipated Testimony of BPM Witnesses

Mr. Berger assumes that ███████████████████████████ will testify consistent with their grand jury testimony, *see supra*, at 7-8 & n.5, at trial.  Mr. Berger expects the following exculpatory testimony from other BPM witnesses:

---

[11] The February 5, 2018 request included all but one of the proposed defense witnesses listed here. On February 15, 2018, counsel for Mr. Berger sought immunity for an additional witness, ███████ ███████ who was not included in the February 5 email.  The government eventually declined that request for immunity, as well. *See* Kane Decl. ¶ 4.

- ████████ a BPM tax partner who is licensed as both a CPA and an attorney, will testify that he assisted in the preparation of Mr. Burrill's tax returns by responding to Mr. Berger's request for advice about the appropriate tax treatment of the Fund III transfers. Specifically, Mr. Berger expects ████████ to confirm that he responded to Mr. Berger's email inquiry by providing the citation to a particular case that supported treatment of the payments as loans. Ex. 1.

- BPM tax partner ████████ would also testify that she assisted in the preparation of Mr. Burrill's tax returns by responding to Mr. Berger's request for advice about the appropriate tax treatment of the Fund III transfers. ████████ would testify that, based on her understanding of the arrangement between the Fund and the management company, and in reliance on PwC's footnote, she recommended treating the cash transfers as loans. *Id.*

- BPM's ████████████████ would testify that Mr. Berger and ████████ shared with him their approach to classifying the Fund III transfers as loans, and that he agreed with and supported their approach and acknowledged that he had taken that approach with other clients. Ex. 2.

- Current and former BPM tax partners ████████████████ ████████████████ also received the same email from Mr. Berger seeking advice on the appropriate tax treatment for the factual scenario the Burrill Fund III transfers presented. Thus, Mr. Berger anticipates that they would each testify that he sought their advice about the appropriate tax treatment of the transfers. Ex. 1.

## III. LEGAL STANDARD

"In general, a defendant is not entitled to compel the government to grant use immunity to potential defense witnesses who invoke their right against self-incrimination." *United States v. Prince*, 524 F. App'x 377, 379 (9th Cir. 2013) (citation omitted). But a defendant may be able to compel the government to immunize a witness if the government's use of immunity denies the

defendant the due process guaranteed by the Fifth Amendment. *United States v. Alessio*, 528 F.2d 1079, 1081-82 (9th Cir. 1976).

To show that due process requires the district court to compel use immunity, a defendant must show that "(1) the witness's testimony would have been relevant, and (2) the prosecution refused to grant the witness use immunity with the deliberate intention of distorting the fact-finding process." *United States v. Straub*, 538 F.3d 1147, 1156 (9th Cir. 2008) (citing *Williams v. Woodford*, 384 F.3d 567, 600 (9th Cir. 2004). The first prong presents only a "minimal" bar; defendant "need not show that the testimony sought was either clearly exculpatory or essential to the defense." *Straub*, 538 F.3d at 1156 (citations omitted).

There are two ways to satisfy the second prong. The defendant must show that "*either* (a) the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; *or* (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the *effect* of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial." *Id.* at 1162 (emphasis added); *see also United States v. Westerdahl*, 945 F.2d 1083, 1087 (9th Cir. 1991).

If the Court concludes that the government distorted the fact-finding process by causing a defense witness to invoke his privilege against self-incrimination, the Court must dismiss the indictment unless the government grants use immunity to the witness. *Straub*, 538 F.3d at 1161. If, however, the Court concludes that the government selectively denied use immunity to defense witnesses in a manner that distorts the fact-finding process, the government has three options: (1) acquittal, if it continues to insist on granting immunity only to its witness; (2) proceeding to trial using its immunized witness only if it invokes 18 U.S.C. §§ 6002-6003 to ask the district court to extend use immunity to the defense witnesses at issue; or (3) attempt to proceed at trial without the witness whose testimony the defense witnesses would have contradicted. *Straub*, 538 F.3d at 1161.

## IV.   ARGUMENT

While judicially-compelled witness immunity is the exception rather than the rule, this case is anything but typical. Here, Mr. Berger will be denied a fundamentally fair trial if the proposed defense witnesses are not granted immunity. The government's conduct implicates both routes to immunity described in *Straub*. First, the defense witnesses have relevant exculpatory testimony to offer at trial on behalf of Mr. Berger. But the government has ensured the silence of any BPM at trial for fear of possible indictment. *See* Kane Decl. ¶ 8. As a result, Mr. Berger will be deprived of the opportunity to elicit critical exculpatory testimony. The government's withholding of immunity, despite the fact that it has no real intent to prosecute any of the proffered defense witnesses, requires the government to grant use immunity to these witnesses or, in the alternative, to dismiss the indictment.

Second, the government has demonstrated that it is not adverse to providing this relief as necessary to secure the testimony of its own witnesses. The government has already entered into a non-prosecution agreement with ▆▆▆▆▆ and is likely to reach a similar arrangement with ▆▆ ▆ while refusing to afford even a single one of Mr. Berger's many proposed witnesses the same protection. This selective denial of use immunity would distort the fact-finding process because all of these potential defense witnesses would offer exculpatory testimony that directly contradicts the anticipated testimony of the government's immunized witness(es). To assure due process, the Court must level the playing field by compelling the government to grant use immunity to Mr. Berger's witnesses, proceed without its immunized and cooperating witness(es), or dismiss the indictment.

### A.   The Government has Intentionally Placed the Proposed Defense Witnesses in Fear of Indictment to Provoke them into Invoking the Fifth Amendment

1. The proffered defense witnesses will offer relevant exculpatory testimony.

The government must grant immunity to a defense witness if "the defense witness's testimony w[ould be] relevant" and "the prosecution intentionally [sought to] cause[ ] the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process." *Straub*, 538 F.3d at 1162. So it is here with respect to Mr. Berger's proposed defense witnesses. As detailed above, the testimony of each of the BPM

witnesses tends to corroborate that Mr. Berger prepared the Burrill tax returns in good faith and is therefore not criminally culpable.

Collectively, this testimony is directly relevant to Mr. Berger's defense to the indictment allegations. That so many witnesses either were privy to Mr. Burrill's characterization—through ████████████████ of the transfers as loans, or substantiate that Mr. Berger sincerely believed Mr. Burrill's characterization, demonstrate that Mr. Berger did not have the requisite state of mind to support a criminal conviction for assisting in the filing of a false tax return. Depriving Mr. Berger of the opportunity to present the proffered exculpatory testimony in his defense would distort the fact-finding process.

     2.    <u>Absent a grant of immunity, the government's aggressive charging posture in this matter will force potential defense witnesses to invoke their Fifth Amendment rights against self-incrimination.</u>

Turning to the second portion of the test, the government has taken "affirmative steps" to prevent these witnesses from testifying by putting them in a position where they will have no choice but to invoke the Fifth Amendment if called to testify. *Straub*, 538 F.3d at 1157 (citation and emphasis omitted). At some point between Mr. Berger's grand jury testimony on May 5, 2016—when Mr. Berger was explicitly advised that he was not a target—and the presentation to a different grand jury beginning in June 2017, and with no notice to him, the government changed its view of Mr. Berger's status.[12] Mr. Berger's subsequent indictment put his BPM colleagues on notice of the government's expansive view of what constitutes criminal conduct. Mr. Berger is now a cautionary tale and the BPM witnesses and their counsel must evaluate the risks of testifying without immunity against that backdrop.

The indictment alleges that Mr. Berger assisted in filing false and fraudulent tax returns for Mr. Burrill from October 2012 until October 2014. The statute of limitations will not run on this conduct for at least another year. *See* 26 U.S.C. § 6531(3) (setting forth a six-year statute of limitations for willfully aiding or assisting in the filing false tax returns). The BPM witnesses who

---

[12] Only ████████████████████████████████ testified before the first grand jury following Mr. Berger's testimony, and nothing else in the discovery produced to date explains the dramatic shift with respect to the government's assessment of Mr. Berger. Kane Decl. ¶ 31.

assisted in the preparation of Burrill's returns are therefore still subject to prosecution. The remaining allegations turn on Mr. Burrill's transfer of Fund III cash to his management company as late as August 30, 2013, and the Burrill entity witnesses are not out of the woods based on their participation and assistance in the wide-reaching fraud Mr. Burrill perpetrated against the fund's limited partners.[13]

The grand jury investigation into this matter spanned three years and resulted in charges against only Mr. Burrill and Mr. Berger. The government has not added any new defendants since the indictment issued five months ago. To the contrary, it has represented to undersigned counsel that it has already exercised its discretion to make charging decisions in this matter. *See* Kane Decl. ¶ 6. And yet, the government refuses to immunize any of the proposed defense witnesses whose testimony would aid in Mr. Berger's defense at trial. Holding the threat of indictment over a witness's head with no actual intent to indict is the type of witness intimidation that constitutes "substantial interference" with the witnesses' "free and unhampered determination to testify" and that violates the defendant's right to due process. *Straub*, 538 F.3d at 1158.

In short, because the government intentionally has sought to ensure that the defense witnesses would invoke their Fifth Amendment privilege against self-incrimination if called to testify at trial, it must either seek use immunity for their testimony or dismiss the indictment.

**B.**     **The Government's Selective Refusal to Immunize Potential Defense Witnesses who would Contradict the Testimony of the Government's Immunized Witness would Distort the Fact-finding Process.**

Another way to establish that the government's use of immunity violates the defendant's due process right is to demonstrate that "the defense witness's testimony w[ould be] relevant" and that "the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness[.]" *Straub*, 538 F.3d at 1162. While the first prong of the defense-immunity doctrine requires the defendant to establish intentional prosecutorial

---

[13] As noted above, a number of the subject defense witnesses have previously testified in earlier proceedings related to the instant criminal matter without invoking the Fifth Amendment. However, that testimony preceded the unpredicted indictment of Mr. Berger. The witnesses are now on notice of the government's expansive interpretation of criminal liability in this matter, and may analyze the inherent risk of self-incrimination differently as a result.

DEFENDANT'S MOTION FOR                                                                                     16
DEFENSE-WITNESS IMMUNITY
[CR-17-0491-RS]

misconduct, this prong looks only to the effect of the government's selective grant of immunity. *See id.*; *Westerdahl*, 945 F.2d at 1087. Put simply, the government's motive is not relevant under this analysis, and compelled immunity is appropriate if denying the defendant the opportunity to present contradictory evidence would distort the fact-finding process. *See Straub*, 538 F.3d at 1162; *Westerdahl*, 945 F.2d at 1087.

Here, the government has already exercised its discretion to grant immunity in order to secure the testimony of a favorable witness, ██████. And ██████ immunity is all but guaranteed for the reasons noted above. Moreover, Mr. Berger has shown that each of his potential defense witnesses would offer relevant, exculpatory testimony that would contradict ██████ (and ██████), both directly and by implication. To prove beyond a reasonable doubt that a tax preparer assisted in the filing of a false tax return, the government must prove not just falsity as to material content of the tax return, but that the defendant *knew* the returns were not true as to every material matter and that he willfully intended to violate the law. *See United States v. Dahlstrom*, 713 F.2d 1423, 1427 (9th Cir. 1983); *see also Kawashima v. Holder*, 565 U.S. 478, 484 (2012) (noting that the elements of a § 7206(2) violation include that the defendant acted willfully).

Mr. Berger anticipates that ██████ will testify that Mr. Berger *suggested* characterizing the Fund III cash transfers as a loan on his own, not because Mr. Burrill, through ██████ and ██████, described them that way when the characterization question was raised by Mr. Berger. *See* Ex. 21 ¶ 41. If credited, the government will ask a jury to infer from ██████ testimony that Mr. Berger knew that Mr. Burrill had a significant tax liability and suggested the loan characterization to shield Mr. Burrill from it unlawfully. ██████ testimony would directly contradict the immunized witness(es)' origin story of the loan characterization. Specifically, ██████ recalls that she and Mr. Berger *questioned* ██████ about the nature of the "deferred revenue" liability and, only *after* being told that Mr. Burrill was personally liable, concluded that the transfers should be treated as a loan for tax purposes. Other BPM tax partners' anticipated testimony regarding Mr. Berger's solicitation of advice on the matter, also contradicts the immunized witnesses' testimony and tends to corroborate ██████. If Mr. Berger had already devised a plan for Mr. Burrill to avoid taxes, whether or not supported by

the facts, there was no reason for Mr. Berger to seek input and guidance from his colleagues.

Similarly, if Mr. Berger was intentionally engaged in unlawful behavior it is unlikely that he would broadcast his actions so broadly within BPM. Mr. Berger's email to other BPM partners suggests conscientious tax preparation, not fraud and deceit.

There are no other witnesses or other sources of this crucial information about Mr. Berger's lack of knowledge and intent besides the proposed defense witnesses, and their testimony would directly contradict the immunized government witness(es). The Ninth Circuit has "found direct contradictions where witnesses offer differing accounts of factual circumstances[,]" *United States v. Wilkes*, 744 F.3d 1101, 1105 (9th Cir. 2014), and granted immunity requests accordingly. For example, in *Straub*, an immunized government witness conceded that, if asked, he would deny that he had confessed to a defense witness that he had "just shot a guy." 538 F.3d at 1162. The court granted the defendant's request to compel immunity for his witness, who was prepared to testify that the government witness had confessed to the same crime attributed to the defendant. *Id.* at 1162-63. Similarly, in *United States v. Young*, 86 F.3d 944, 946 (9th Cir. 1996), the government's witness, John Drake, planned to testify that the two defendants used him as a middleman to distribute cocaine. The court granted the defendants' request for immunity for a witness who was prepared to testify that he heard Drake say he was falsely accusing someone as being his supplier, which the court concluded directly contradicted Drake's testimony. *Id.* at 947.

In contrast, in *United States v. Alvarez*, 358 F.3d 1194, 1216 (9th Cir. 2004), the court concluded the testimony sought—that the defense witness had been to many stash houses in the area but had never been to the defendant's house—did not directly contradict statements by the government's witnesses that the defendant's house was a stash house and denied the defendant's immunity request. Put simply, "a witness directly contradicts another witness if their respective testimonies cannot simultaneously be true, although in this context the proffered defense testimony need only support (as opposed to compel) a finding by the jury that it was directly contradictory." *Wilkes*, 744 F.3d at 1106.

This case is more like *Straub* and *Young* than *Alvarez*. Certainly, the ████████ and ████████ descriptions of the origin story of the loan characterization cannot both be true. While

the testimony of other BPM partners does not contradict the immunized witness testimony head-on, it certainly undercuts the government's theory and casts serious doubt as to Mr. Berger's state of mind. Thus, the rationale behind the grants of immunity in *Straub* and *Young* compels the same conclusion here: because the proposed defense witnesses' testimony directly contradicts the immunized witnesses' testimony, the government's refusal to provide the defense witnesses use immunity would be a distortion of the fact-finding process to the point where it would deny Mr. Berger a fair trial. *See Alessio*, 528 F.3d at 1082

To be sure, in *Straub*, the court concluded that due process-infringing unfairness occurred "where the government has liberally used its discretion to grant immunity to numerous witnesses" rather than the one or two potentially immunized witnesses at issue here. 538 F.3d at 1160. But the Ninth Circuit has never held that immunity for handfuls of government witnesses in the face of a single defense witness is the only scenario that could give rise to judicially-compelled immunity. Instead, it has recognized that it can apply when only "two eyewitnesses tell conflicting stories, and only the witness testifying for the government is granted immunity . . . ." *Westerdahl*, 945 F.2d at 1087 (citations omitted). If anything, the fairness interest is all the more compelling when the government's case rests on just one or two witnesses whose testimony would be crippled by the testimony of a cadre of other witnesses.

//
//
//
//
//
//
//
//
//
//
//

# V.  CONCLUSION

To ensure Mr. Berger's due process rights to a fundamentally fair trial, and for all of the reasons described above, the Court should grant Mr. Berger's motion and compel the government to grant use immunity to his potential witnesses.  If the government refuses to grant use immunity to the potential defense witnesses it has intentionally placed in dangerous legal peril to cause them to invoke their Fifth Amendment privilege, the Court must dismiss the indictment.  Separately, the Court should compel the government to grant use immunity to the proposed defense witnesses because they would offer contradictory testimony to the government's immunized witnesses.  In the alternative, the government must withdraw its immunized witness(es) or the Court must dismiss the indictment.

Dated: February 22, 2018

KANE+KIMBALL LLP


*/s/ Miranda Kane*
MIRANDA KANE
JULIA M. BREYER

**Attorneys for Marc Berger**