UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>MARC HOWARD BERGER,<br>Defendant. | Case No. 17-cr-00491-RS-1<br><br>**ORDER DENYING DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AND FOR A NEW TRIAL** |

## I. INTRODUCTION

In June 2018, defendant Marc Berger was convicted by a jury of three counts of aiding and abetting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2). Berger now moves for a judgment of acquittal under Rule 29 or, in the alternative, a new trial under Rule 33. For the reasons explained below, both motions are denied.

## II. BACKGROUND

The charges against Berger arose from his role as a tax partner at the accounting firm Burr Pilger Mayer ("BPM"), where he oversaw the preparation of tax returns for G. Steven Burrill and for several of Mr. Burrill's wholly-owned eponymous entities. Among these entities was Burrill Capital Management LLC ("Burrill Capital"), which served as the management company for Burrill Life Sciences Capital Fund III ("Fund III"), a venture capital fund in the biotech industry.

In September 2017, a grand jury returned an indictment against Berger charging him with three counts of aiding and abetting Burrill in filing false tax returns, in violation of 26 U.S.C. § 7206(2). The indictment alleged Berger helped Burrill prepare tax returns which falsely reported

Burrill's income as less than $0. To establish a violation of section 7206(2) the government must show: (1) the defendant aided or assisted in the preparation of a fraudulent income tax return; (2) the tax return was false or fraudulent as to a matter necessary to determine whether income tax was owed; and (3) the defendant acted willfully. Berger conceded the first two elements therefore the case turned on whether he knew the money transferred from Fund III to Burrill's management companies was income, or whether he believed the transfers were loans and therefore not otherwise taxable.

The case proceeded to trial in June 2018. At the end of the government's case, the defense unsuccessfully moved for a judgment of acquittal under Rule 29. The jury subsequently returned a guilty verdict on all three counts. Berger now moves for a judgment of acquittal under Rule 29 or, in the alternative, a new trial under Rule 33.

### III. LEGAL STANDARD

#### A. Rule 29: Motion for Judgment of Acquittal

After a jury has returned a guilty verdict, a district court "may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). When evaluating whether to grant a motion for acquittal the court "must consider the evidence presented at trial in the light most favorable to the prosecution" and resolve all inferences in the government's favor. *United States v. Begay*, 673 F.3d 1038, 1043 (9th Cir. 2011) (quoting *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc)). The court must determine "whether the evidence, so viewed, is adequate to allow 'any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Nevils*, 598 F.3d at 1164). If the government fails to provide sufficient evidence of an essential element of the crime, the court must grant the motion for acquittal. *United States v. Katakis*, 800 F.3d 1017, 1023-24 (9th Cir. 2015).

#### B. Rule 33: Motion for a New Trial

Under Rule 33, a court may vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court's power to grant a motion for a new trial is "much broader than its power to grant a motion for judgment of acquittal." *United States v.*

*Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). In considering whether to grant a new trial, the court may weigh the evidence and "evaluate for itself the credibility of the witnesses." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992). If the court concludes "the evidence preponderates heavily against the verdict," it may set aside the conviction and grant a new trial. *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984). A new trial may also be warranted based on an "incorrect evidentiary ruling or an erroneous jury instruction if a party was substantially prejudiced." *United States v. Hussain*, No. 16-cr-00462-CRB, 2018 WL 3619797, at *21 (N.D. Cal. July 30, 2018) (citing *United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992)). "Improprieties in counsels' arguments to the jury," however, do not generally require a new trial unless they are "so gross as probably to prejudice the defendant." *United States v. Parker*, 549 F.2d 1217, 1222 (9th Cir. 1977).

## IV. DISCUSSION

### A. Sufficiency and Weight of the Evidence

Berger's primary argument is that the government's evidence is insufficient to support a conviction. In the alternative, Berger argues the weight of the evidence preponderates against a conviction therefore justifying a new trial. The only disputed element in this case is whether Berger *knowingly* helped Burrill file false returns.

Berger characterizes the government's case as consisting exclusively of weak circumstantial evidence. According to Berger, the "centerpiece of the government's circumstantial case" was testimony by Burrill's financial staff that Berger advised Burrill to change the name of the 2-1800 account from "Deferred Revenue" to "Note Payable" and to execute a promissory note to document the purported loans. In Berger's view, this evidence is consistent with his innocent explanation that he believed the payments were loans. Berger also attempts to undermine the government's argument that Berger must have known the loans were fraudulent based on Burrill's refusal to create a promissory note. Berger contends this evidence is rebutted by testimony from Berger's colleagues and from expert witness Karen Hawkins that the absence of a promissory note would not change the nature of the underlying transaction. Berger also points to emails from 2013

where Berger referred to Burrill having an $18 million debt obligation to Fund III, and to Hawkins' testimony that Berger reasonably relied on Burrill's representation that he was obliged to repay the Fund III transfers. Finally, Berger argues the government failed to establish a motive for him to assist in the filling of a fraudulent tax return.

Direct proof of wrongful intent is "rarely available." *United States v. Dearing*, 504 F.3d 897, 901 (9th Cir. 2007). Specific intent may therefore be demonstrated by circumstantial evidence alone. *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003). For example, the government points out that BPM decided to treat the Fund III transfers as loans only after Berger learned that Burrill would owe a substantial amount of income tax on the payments. Berger also read and was familiar with Fund III's limited partnership agreement ("LPA"), which forbade loans and advance management fees. Accordingly, Berger must have known that an "interest free, unsecured, undocumented loan was wholly inconsistent with the LPA." Opp. Mot. J. Acquittal 7. The government further notes that Berger was aware Burrill had previously recorded the Fund III transfers as prepaid expenses in Fund III's books and as deferred revenue in Burrill Capital's books, rather than as loans. Finally, the government points to evidence that by November 2013 Berger was aware Burrill had been accused of misappropriating funds, yet still signed off on Burrill's fraudulent 2013 tax returns.

Viewing the trial record as a whole, there is sufficient evidence to support the jury's conclusion that Berger acted willfully. Furthermore, Berger fails to show the weight of the evidence preponderates against a conviction.

### B. Whether Erroneous Evidentiary Rulings Require a New Trial

Berger argues the trial record is replete with erroneous evidentiary rulings whose cumulative effect requires reversal of the conviction. *See United States v. Inzunza*, 638 F.3d 1006, 1024 (9th Cir. 2011) ("Even if no error individually supports reversal, the cumulative effect of numerous errors may support reversal."). Berger contends the prejudicial effect of the purportedly erroneous rulings is particularly significant here because the government's case is weak. *United States v. Bordewick*, No. CR-06-00022-DLJ, 2008 WL 4058665, at \*4 (N.D. Cal. Aug. 27, 2008).

1. Admission of Evidence of Burrill's Fraud

Berger argues he was prejudiced by the admission of evidence that related "only to Burrill's fraud." Mot. J. Acquittal 11. Berger specifically objects to the admission of (1) testimony from Burrill employee Roger Wyse, (2) testimony from Fund III investor representative Craig Demko, and (3) "piles of capital call letters, agreements and side letters between Fund III and its investors."[1] *Id.* According to Berger, this evidence ran afoul of the Court's admonition that the government "focus its presentation of any fraud-related evidence on material that is relevant to what Berger knew," and should have been excluded under Federal Rule of Evidence 403. Order Re Mot. In Lim. 2. Berger further contends the government used Demko's testimony to highlight that the investment fund included a pension plan that benefited public servants such as police officers and teachers. Finally, Berger argues the government improperly invited the jury to infer Berger participated in Burrill's fraud based solely on proof of Burrill's fraud rather than on proof of Berger's subjective intent.

The admission of evidence of Burrill's fraud was well within the court's broad discretion under Rule 403. *See R.B. Matthews, Inc. v. Transamerica Transp. Servs.*, 945 F.2d 269, 272 (9th Cir. 1991). The Wyse and Demko testimony demonstrated that Burrill lacked the authority to issue himself a loan. These facts are relevant because Berger reviewed Fund III's operating documents and therefore must have known the transfers were not bona fide loans. The call letters and other documents demonstrating Burrill's fraud were similarly relevant to address whether the transfers were bona fide loans. Finally, Berger's knowledge of the fraud is supported by other evidence in the record. For example, the evidence demonstrated that by November 2013 Berger knew Burrill had torn up the promissory note to avoid disclosing it to investors and that he was being accused of improperly calling capital from Fund III.

---

[1] The government notes Berger did not object to any of these documents at the time they were admitted. Berger argues he was forced to adopt a strategy of non-objection to the evidence of Burrill's fraud to avoid appearing obstructionist or unduly concerned. While Berger is entitled to make that strategic call, the consequences remain that any objection has been waived.

In short, Berger's arguments are unavailing. The evidence of Burrill's fraud was necessary for background and context and to establish the returns were fraudulent. Furthermore, Berger's argument that the government misled the jury to convict Berger based solely on evidence of Burrill's actions is unpersuasive considering the substantial evidence that Berger was aware the Fund III payments were not loans. Accordingly, the aforementioned evidence was properly admitted.

### 2. Exclusion of Evidence Regarding Burrill's Post-2014 Tax Liability

According to Berger, several pieces of evidence relating to Burrill's post-2014 tax liability were improperly excluded. Berger specifically contests the exclusion of (1) some aspects of Erik Weinapple's testimony and (2) emails which purportedly reflect Berger's state of mind regarding the Fund III payments. Berger finds it inconsistent that the government was permitted to introduce Sarah Schoech's handwritten notes taken in 2015 whereas Berger was prevented from introducing his post-2014 emails.[2]

Exclusion of these post-2014 statements was proper because they were irrelevant and prejudicial under Rule 403, and constituted hearsay falling outside any exception. The emails do not qualify under the the business records exception because they were created while Berger was working as Burrill's litigation consultant rather than during the course of ordinary business. These emails similarly do not qualify for the state-of-mind exception because the statements were not made contemporaneously. *United States v. Emmert*, 829 F.2d 805, 809-10 (9th Cir. 1987). In fact, by the time these emails were sent, Berger was aware of the investigation into Burrill's fraudulent tax returns and had time to reflect before he made statements about his state of mind. *See United States v. Ponticelli*, 622 F.2d 985, 991 (9th Cir. 1980). Finally, Weinapple's testimony about how he calculated Burrill's 2015 and 2016 taxes is irrelevant and was therefore properly excluded under Rule 403. Accordingly, the exclusion of the post-2014 evidence was proper and did not

---

[2] The Schoech notes were introduced under the past recollections recorded exception. Fed. R. Evid. 803(5).

unfairly prejudice Berger.

### 3. Emails Written by Berger Relating to His State of Mind

Berger argues several of his emails were improperly excluded as hearsay, specifically Defense Exhibits 28, 55, and 126. According to Berger, DX 28 was not introduced to show that Burrill "[was] personally liable for the debt," but rather to show that Berger believed this to be true at the time the email was sent. DX 28. Berger also contends DX 126 was offered simply to show that he was contemplating the tax consequences of a sale of carried interest, and therefore believed Burrill was personally liable for the purported loans.[3] Finally, Berger contends each of these emails qualifies for the business records exception.

The government objected to the introduction of each of these emails as inadmissible hearsay. Berger's strongest argument is that DX 28 reflected his subjective belief that Burrill was personally liable to repay the Fund III payments, regardless of the truth or falsity of the assertions in the email. Read in context, however, Berger's email asserts that he met with Burrill and that Burrill stated that he was liable to repay the purported loans.[4] When viewed in this light, DX 28 clearly constitutes hearsay. Furthermore, Berger fails to establish the requisite elements of the business records exception. Accordingly, there was no error in the exclusion of these three exhibits.

### 4. Audio Recordings of Berger's SEC Testimony

Berger argues it was error to allow the government to introduce audio recordings of his testimony before the Securities and Exchange Commission ("SEC"). He alleges the government's untimely production of this evidence forced his counsel to spend hours reviewing the recordings when they "should have been singularly focused on preparing opening statement and witness examinations." Mot. J. Acquittal 15. In response, the government notes that it produced transcripts

---

[3] Berger asserts without explanation that DX 55 was not introduced for the truth of the matter asserted.

[4] The email states in pertinent part: "Met with Steve. He is personally liable for the debt issue we discussed." DX 28.

of Berger's SEC testimony over a month before trial. The government also argues Berger is unable to demonstrate "a likelihood that the verdict would have been different had the government complied with the discovery rules." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997) (quoting *United States v. Baker*, 10 F.3d 1374, 1398 n.8 (9th Cir. 1993). In particular, there is no indication Berger's cross-examination of witnesses or opening argument suffered as a result of any delayed disclosure.

Once again, the government's arguments are persuasive. Berger has not shown any prejudice warranting exclusion of the audio recording. Furthermore, Berger's access to the transcripts well in advance of trial undermines his argument that admission of the audio recordings meaningfully prejudiced him.

       5.   Jackie Matsumura's Immunity Instruction

Berger argues the Court erred in declining to provide specialized instructions regarding Jackie Matsumura's court-ordered immunity. According to Berger, without a special instruction, the jury was free to conclude that Matsumura's immunity, like Helena's Sen's immunity, was in exchange for the government agreeing not to prosecute her. In reality, Matsumura's immunity was ordered, over the government's objection, to protect her from being charged based on her testimony. As a result of the options outlined in the order, the government elected to offer immunity to Matsumura. Accordingly, her testimony was ultimately given in the same posture as the other witnesses immunized by the government.

Berger's argument that the jury required a more detailed explanation of the difference between Sen's immunity and Matsumura's immunity is unpersuasive. The Matsumura instruction[5] was derived from the Ninth Circuits model jury instructions, Ninth Cir. Model Instr. 4.9, and adequately apprised the jury of the basis for, and effect of, Matsumura's immunity.

---

[5] The following instruction was given: "You have heard testimony from Jackie Matsumura, a witness who received immunity. That testimony was given in exchange for a promise by the government that the testimony would not be used in any case against Ms. Matsumura. For this reason, in evaluating the testimony of Ms. Matsumura, you should consider the extent to which or whether her testimony may have been influenced by this factor. In addition, you should examine the testimony of Ms. Matsumura with greater caution than that of other witnesses." Jury Instr. 15.

### 6. Sarah Schoech's Handwritten Notes

Berger argues it was error to allow the handwritten notes of BPM staff accountant Sarah Schoech to be read into the record. It is undisputed that Schoech customarily took notes during meetings, for her own use. The government sought to introduce two sets of Schoech's notes at trial. Berger argues the government failed adequately to lay the foundation for these notes. Berger further argues the government "cherry pick[ed]" the most prejudicial lines and "improperly attribute them" to Berger despite ambiguity about who made each statement. The notes were properly admitted as past recollections recorded. Fed. R. Evid. 803(5). Furthermore, Berger's participation in such conversations was relevant even if some of the statements were not attributable to him. Any ambiguity about which meeting participant said any particular statement goes to the weight of the evidence, not its admissibility.

### 7. Oertel Testimony

Berger contends the Court erred in permitting the government's expert, Revenue Agent James Oertel, to opine on the correct tax treatment of the Fund III transfers because this testimony exceeded his area of expertise. Berger also objects to Oertel's testimony about objective loan indicia because it "wrongly invited the jury to convict Mr. Berger based on an objective checklist" rather than his subjective state of mind. Mot. J. Acquittal 18. Oertel's testimony about loan attributes did not exceed his expertise given that he has audited approximately 5,000 tax returns and dealt with loan issues on several occasions. Furthermore, the government did not invite the jury to convict based on anything other than Berger's state of mind and correctly described the elements of the crime in its closing. Indeed, Oertel's testimony regarding loan indicia ultimately bears on the *plausibility* of Berger's argument that he subjectively believed the payments were loans. Accordingly, admission of Oertel's testimony was proper.

### 8. Beamish Deposition and Government Rebuttal Case

Berger argues the Court's decision not to require Adrian Beamish to return from a trip to England to testify at trial was prejudicial. According to Berger, this decision forced Berger to depose Beamish to preserve his testimony for trial. The government subsequently introduced

portions of this cross-examination testimony at trial as part of its rebuttal case. Berger argues the Court's ruling therefore allowed the government to introduce deposition testimony that otherwise would not have been available. Berger also argues Beamish's testimony was not proper rebuttal testimony. Finally, Berger argues Beamish's testimony that he did not believe the Fund III transfers were loans improperly invited the jury to convict Berger based on an objective rather than subjective standard.

As Beamish was not a central witness in the case, the Court encouraged the parties to work out an alternative solution to requiring his return from a pre-arranged overseas trip. The parties subsequently agreed to take Beamish's deposition to preserve his testimony for trial. The deposition testimony was proper rebuttal evidence because it countered: (1) Matsumura's testimony that she and Berger relied on the PricewaterhouseCoopers ("PwC") audit in determining whether the Fund III payments were loans, and (2) defense expert Hawkins' testimony that Berger reasonably relied on PwC's analysis in determining the payments were loans.

As explained in the order issued on July 12, 2018, Berger's "examination of Jackie Matsumura, among other evidence, has identified PwC's audit as relevant to this case and has thereby 'opened to the door'" for the government's use of Beamish's testimony regarding PwC. Order Re Beamish Test. & Berger Email Evid. 1. Beamish's testimony about the limits of the PwC audit allowed the jury to assess Berger's purported reliance on PwC. Furthermore, Berger's argument that Beamish's testimony invited the jury to convict him based on an objective rather than subjective standard is unpersuasive. Accordingly, Beamish's testimony was properly admitted.

**C. Whether the Government's Conduct Confused or Misled the Jury**

A trial court may grant a new trial if counsel's misconduct during trial likely affected the verdict. *Interstate Markings, Inc. v. Mingus Constructors, Inc.*, 941 F.2d 1010, 1015 (9th Cir. 1991). Berger contends that a new trial is warranted because the government intentionally confused the jury by referring to deferred revenue issues on the books of Burrill entities that took no part in the alleged fraud. Mot. J. Acquittal 21. Berger also argues the government

misrepresented the facts in its closing argument by saying Berger was going to "wipe out" millions of dollars of Burrill's income. *Id.* 21-22. Finally, Berger argues the government improperly insinuated that Berger conspired with Burrill to defraud the IRS despite the evidence that Berger urged Burrill to execute a promissory note.

The government properly drew the jury's attention to Berger's consideration of other entities' books to show that Berger was familiar with the topic of deferred revenue and that he did not typically delegate deferred revenue questions to his staff. Berger's work on other deferred revenue issues supports the inference that he personally worked on the deferred revenue question at issue in this case. That Berger was trying to "wipe out" Burrill's income was supported by evidence that treating the deferred revenue payments as loans would render the payments non-taxable. In short, the government's arguments were fairly supported by the evidence and were relevant to the government's theory of the case. Therefore, Berger has not demonstrated any misconduct, much less misconduct that warrants a new trial.

### D. Whether the Government Constructively Amended the Indictment

Under the Fifth Amendment, a defendant has a right to be tried only on the grand jury's indictment. *United States v. Olson*, 925 F.2d 1170, 1175 (9th Cir. 1991), *abrogated in part on other grounds by United States v. Cotton*, 535 U.S. 625, 630 (2002). A trial court may therefore set aside a verdict and order a new trial if there is a constructive amendment or a material variance in the indictment. *United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006). An amendment occurs when "the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984). Alternatively, a variance exists when "the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.*

Berger argues the government based the indictment on the theory that Burrill did not report the advance management fees as deferred revenue. According to Berger, the government changed its position at trial by arguing that Berger knew the returns were false because he knew the money in the 2-1800 account was stolen from Fund III. Accordingly, Berger contends the

"misrepresentation specified in the indictment and the misrepresentation shown at trial" were different. *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002).

The indictment alleges that Berger filed tax returns showing an income of $0 despite knowing Burrill's income was more than that amount. The jury instructions and verdict form closely track the language in the indictment. Accordingly, the government proved what the indictment alleged—that Berger knowingly filed tax returns that understated Burrill's income. The fact that the government sought to prove that Berger knew the payments were the product of theft is consistent with the indictment. The Ninth Circuit's holding in *Adamson* is not to the contrary. In *Adamson*, the government attempted to convict the defendant for a misrepresentation that was different than the misrepresentation specified in the indictment. 291 F.3d at 609-10, 615-16. Here, by contrast, the government proved specifically what was alleged in the indictment.

## IV. CONCLUSION

For the reasons set forth above, Berger's motions for a judgment of acquittal and for a new trial are denied.

**IT IS SO ORDERED**.

Dated: 11/15/2018

_____
RICHARD SEEBORG
United States District Judge